IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEM FINANCIAL SERVICES, LLC d/b/a NORTHWESTERN MUTUAL – PITTSBURGH and CRAIG FIEDLER,<br><br>Plaintiffs,<br><br>v.<br><br>TANIA JEROME,<br><br>Defendant. | CIVIL DIVISION<br><br>Case No. 3:21-cv-119 |

## VERIFIED COMPLAINT

KEM Financial Services, LLC d/b/a Northwestern Mutual - Pittsburgh ("KEM") and Craig Fiedler ("Fiedler") (collectively "Plaintiffs"), by and through their undersigned counsel, file this Verified Complaint against Tania Jerome ("Jerome") seeking monetary damages.

**A.   Introduction**

1. This action is brought seeking compensatory damages, attorneys' fees, and other appropriate relief against Defendant in connection with her unlawful solicitation of Plaintiffs' customers' replacement insurance policies held with The Northwestern Mutual Life Insurance Company ("NM") and its affiliates as well as her misappropriation of NM's trade secrets.

2. Plaintiffs are independent contractors representing NM who themselves and through other independent contractors (who are contracted to them) sell insurance, annuities, and investment products such as variable annuities and variable life insurance with offices in Monroeville, Pennsylvania.

3. Plaintiffs' business is based on the customer relationships they develop, foster and assign to their agents, like Jerome.

4.      Plaintiff Fiedler, who is contracted with Plaintiff KEM, contracted with Jerome as a Full-time Special or Soliciting Agent in the highly competitive insurance industry.

5.      In this role, Jerome had access to Plaintiffs' trade secrets; namely, their most valuable client relationships and other confidential and proprietary information and trade secrets, including information regarding their clients, prospective clients, client files, policy holder data, key contacts, business and marketing plans and strategies, insurance products, fees and pricing (hereinafter collectively referred to as the "Confidential Information and Trade Secrets").

6.      Despite her then-current engagement with Plaintiffs and access to their Confidential Information and Trade Secrets, on or about January 28, 2021, Jerome began working for New York Life Insurance Company ("NYLI"), Plaintiffs' direct competitor.

7.      For more than 11 days, Jerome was engaged by Plaintiffs and NYLI.  During that time, Jerome was accessing her NYLI email account using her NM laptop and was feverishly accessing some of NM's most proprietary data.

8.      In addition to her NYLI email account, Jerome was also accessing her personal email accounts on the NM laptop, while she was accessing client files, client lists, policy lists, etc.  Upon information and belief, Jerome used her personal email accounts and her NYLI email account to steal Plaintiffs' Confidential Information and Trade Secrets for her use on behalf of NYLI.

9.      On February 3, 2021 (five days before she terminated her engagement with Plaintiffs), Jerome accessed her NM laptop and deleted 535 customer-related files and folders within the span of one minute.  Just days prior, Jerome logged into both her NYLI employee email account and her personal "Frontier" email account from the same NM-issued laptop,

strongly suggesting that she may have sent NM information, including the 535 deleted files, outside of NM's network.

10. In fact, Jerome was accessing multiple client, contact, and policy lists shortly before she resigned from NM.

11. On February 1, 2021 at 02:05:09 PM, she accessed "Policy List.xlsx." Five minutes later, Jerome visited her personal Frontier email account from her NM-issued laptop.

12. On January 31, 2021 at 02:36:35 PM, she accessed "Active Contacts.xlsx" which is no longer present on her NM laptop and was not found recoverable in the laptop's recycle bin.

13. On January 31, 2021 at 02:02:13 PM, she accessed "MarketingListPolicyLevelReport.xlsx."

14. On January 19, 2021 at 03:01:16 PM, she accessed "Client List.xlsx."

15. On January 18, 2021 at 03:13:47 PM, she accessed the folder "K.P."[1] from her desktop folder. Approximately one minute later at 03:14:42 PM, she visited her Frontier personal email account. Mr. Pesto was one of her clients during her engagement with Plaintiffs.

16. Just days before her departure, Jerome also was accessing specific client files, for clients such as L.G., D.J., W.M., J.M., P.S., A.B., A.J., N.F., A.F. and D.F.

17. Then, on February 3, 2021, Jerome deleted these client, contact, and policy lists, which had titles such as "Active Contacts 1-31-2021 2-35-35 PM.xlsx,""MarketingListClientLevelReport.xlsx," "MarketingListPolicyLevelReport.xlsx," and "Policy List.xlsx."

18. After stealing the information she needed, Jerome finally resigned from her engagement with Plaintiffs on February 8, 2021. Jerome terminated her relationship with

---

[1] To protect the confidentiality of Plaintiffs' clients, all clients referenced in this Complaint are referred to using their initials.

Plaintiffs and began soliciting Plaintiffs' customers in violation of her non-solicitation obligations to Plaintiffs.

19. To date, Jerome has successfully solicited 24 of Plaintiffs' customers to terminate 28 policies with Plaintiffs and to purchase new, replacement policies with NYLI, amounting to $41,750 in lost premiums.

**B.     Parties**

20. KEM is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 2790 Mosside Boulevard, Suite 400, Monroeville, Pennsylvania 15146-2743.

21. Fiedler is an adult individual who is a citizen of Westmoreland County, Pennsylvania, with an address of P.O. Box 105, Laughlintown, Pennsylvania, 15655.

22. Jerome is an adult individual who is a citizen of Cambria County, Pennsylvania, residing at 204 Kerr Drive, Johnstown, Pennsylvania 15904.

**C.     Jurisdiction and Venue**

23. The Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1331 because the case arises, in part, under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* ("DTSA"). The Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367 because such claims are so closely related to the DTSA claim that they are part of the same case and controversy.

24. This Court has personal jurisdiction over Jerome as she is domiciled within the Commonwealth of Pennsylvania.

25. Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(2) because this lawsuit arises out of events in and impacting Pittsburgh, Pennsylvania, with the key witnesses and documents located in the

Western District of Pennsylvania. In addition, some, or all, of the Confidential Information and Trade Secrets at issue have their situs in the Western District of Pennsylvania, Fiedler is domiciled in Westmoreland County, Jerome formerly worked for Plaintiffs in Allegheny County, Jerome currently works for NYLI in Allegheny County, and Plaintiffs regularly conduct business in Allegheny County.

**D.     Statement of Facts**

26.     Based in Milwaukee, NM is a leading provider of insurance, annuities and investment products such as variable annuities and variable life insurance.

27.     NM contracts with independent contractor General and District Agents across the country, who, in turn, contract with independent contractors to function as agents and solicit applications for Northwestern Mutual insurance and annuities.

28.     KEM is NM's General Agent located in Western Pennsylvania.

29.     Fiedler is NM's District Agent and is contracted with KEM to solicit applications for insurance and annuities; aid in the maintenance of existing insurance policies and annuities; provide advisory services; and service existing and new policyholders, annuitants, and beneficiaries.

30.     To do so, Fiedler contracted agents, including Jerome, to solicit applications for insurance and annuities; aid in the maintenance of existing insurance policies and annuities; provide advisory services; and service existing and new policyholders, annuitants, and beneficiaries.

31.     The insurance industry is a highly competitive marketplace with many firms vying for the same clients.

32. KEM, Fiedler, and NYLI, all of which provide insurance and annuities, provide advisory services, and service existing and new policy and account holders, are direct competitors.

33. Because this requires Plaintiffs to have an intimate knowledge of their clients' unique circumstances, objectives, risk tolerance and future aspirations, Plaintiffs invest significant resources in developing and fostering these relationships through their representatives.

34. Plaintiffs, like their competitors, focus much of their business development efforts through a dedicated group of agents, who are assigned to and cultivate specified accounts and regions. Plaintiffs' financial representatives, like others in the industry, grow Plaintiffs' portfolio in a variety of ways, but most importantly, through relationship building with Plaintiffs' clients and prospective clients. These relationships, built over time, are often the most important factor in selecting an agent, as clients come to rely upon the agent as their point of contact and the "face" of the company.

35. Plaintiffs rely on their agents to be their contact with clients for their insurance needs.

36. Agents gain vast amounts of knowledge about Plaintiffs' clients, including their insurance needs, financial goals, risk tolerance, portfolio and investment strategies. Such information could be easily exploited by a competitor if the competitor was permitted to gain access to such information by engaging one of Plaintiffs' agents and using that agent to solicit Plaintiffs' clients and prospective clients.

37. As such, Plaintiffs place a great deal of trust in their agents by entrusting them with a vital asset – Plaintiffs' relationships with their clients.

38. Plaintiffs also entrusts their agents with Confidential Information and Trade Secrets, including client files and other information regarding clients, potential clients, pricing, products, services, investment strategies, profit margins, sales, sales volumes, unique client needs and goals, etc.

39. Plaintiffs expend a great deal of money through the commissions and other compensation they pay to their agents to build strong client relationships between Plaintiffs and their clients.

40. Fiedler contracted Jerome as a Full-Time Special or Soliciting Agent.

41. Prior to joining Plaintiffs, Jerome had no insurance experience.

42. In her work for Plaintiffs, Jerome gained valuable knowledge and experience in the insurance industry through the mentoring, training and support provided by Plaintiffs.

43. As an agent, Jerome serviced more than sixty (60) of Plaintiffs' valuable clients so that she could further develop these relationships on behalf of Plaintiffs and expand the scope of insurance and investment products and services Plaintiffs provided to those clients.

44. Plaintiffs entrusted Jerome with more than fifty-eight (58) of their Insurance Clients, accounting for more than $64,000 in insurance premiums.

45. As an agent, Jerome was entrusted with Plaintiffs' Confidential Information and Trade Secrets.

46. To protect their valuable client relationships and Confidential Information and Trade Secrets and as a condition of Jerome's position as a Soliciting Agent for Plaintiffs, Plaintiffs required Jerome to execute and agree to the terms of a Full-Time Special or Soliciting Agent's Contract ("Agent's Contract"), which includes obligations that extend after the termination of the contract. *See* Jerome's Agent's Contract, attached hereto as Exhibit A.

47. Jerome's Agent's Contract protects "any and all information, data and/or materials regarding or relating to [NM and Plaintiffs], its business and its clients," including without limitation:

> (i) Any technical and/or business information relating to the Company's products, research and development, production, costs, information systems, profit or margin information, finances, sales materials, marketing, business processes or procedures and future business plans;
>
> (ii) The identities of, and any information, data and/or materials containing personally identifiable information regarding current, prospective or former applicants, policyowners, insureds, payers, beneficiaries, annuitants, accountholders, and/or any other client of the Company or any of its subsidiaries or affiliates (hereinafter, collectively, "Clients").
>
> [Confidential Information and Trade Secrets] shall not include any information which is in the public domain or becomes known in the industry without breach of this Agreement.

*See* Ex. A, ¶ 15.

48. Jerome further agreed and acknowledged that the Confidential Information and Trade Secrets were "vital, sensitive, confidential and proprietary" to NM and Plaintiffs. *See* Ex. A, ¶ 15.

49. Jerome further agreed that both during and after the term of her contract, she would "maintain the confidentiality and security of all such [Confidential Information and Trade Secrets] to prevent the unauthorized disclosure of such [Confidential Information and Trade Secrets]." *See* Ex. A, ¶ 15.

50. Jerome agreed not to "reproduce, alter or tamper with client or business information or materials or any other [Confidential Information and Trade Secrets] other than in furtherance of the activities authorized" by Plaintiffs. See Ex. A, ¶ 15.

51. Jerome agreed to "hold and preserve, in a format prescribed by [NM], all records, including those in electronic or digital form, relating to transactions by, for or with [NM], and all other property of [NM and Plaintiffs] which at any time shall come into [Jerome's] possession or under [Jerome's] control. [Jerome] shall surrender all such records and property to [NM and/or Plaintiffs] upon demand or upon termination of this Agreement." *See* Ex. A, ¶ 11.

52. To protect their Confidential Information and Trade Secrets and important client relationships and in consideration of entering into Agent's Contracts with them, Plaintiffs require their agents, including Jerome, to agree not to solicit Plaintiffs' clients to replace or otherwise surrender their policies for one year following the termination of their relationship with Plaintiffs. *See* Exhibit B, Non-Solicitation Addendum to Part-Time/Full-Time Special or Soliciting Agent's Contract ("Addendum").

53. Specifically, Jerome agreed:

> While my Contract is in effect and for a period of one (1) year following its termination, I will not, directly or indirectly, induce or attempt to induce or assist any Client of the Company, its subsidiaries or affiliates as to whom I have received or am receiving compensation or am providing service or have provided service to withdraw, curtail, reduce, cancel, surrender or terminate any insurance, annuities, securities products or any other existing business or commercial relationship with the Company or any of its subsidiaries or affiliates. I acknowledge and agree that this paragraph does not restrict me from being employed by or engaged in a competing business following the termination of my Contract.

*See* Ex. B, ¶ 1.

54. Jerome further acknowledged and agreed that breach of the obligations contained in Paragraphs 11 or 15 of her Agent's Contract or Paragraph 1 of the Addendum would cause Plaintiffs to "suffer irreparable harm for which the remedy at law may be inadequate." *See* Ex. A, ¶ 16; Ex. B, ¶ 3.

55. Jerome further agreed to reimburse Plaintiffs for their attorneys' fees and costs associated with her breach of the obligations contained in Paragraphs 1 and/or 15 of her Agent's Contract or Paragraph 1 of the Addendum.  *See* Ex. A, ¶ 16; Ex. B, ¶ 3.

56. Jerome agreed that her Agent's Contract and Addendum would be governed by Wisconsin law.  *See* Ex. A, ¶ 27; Ex. B, ¶ 6.

57. Jerome received consideration for signing her Agent's Contract and Addendum with Plaintiffs in the form of the compensation associated with her engagement and the continued opportunity to solicit insurance sales for Plaintiffs in exchange for compensation.

58. Jerome's Agent's Contract and Addendum are valid and enforceable.  Moreover, the post-engagement/post-employment restrictions on solicitation of clients contained therein are fair, reasonable and necessary to protect Plaintiffs' legitimate business interests.  Those business interests are proprietary and establish a competitive advantage in favor of Plaintiffs.

## COUNT I
### Breach of Contract

59. Plaintiffs incorporate by reference Paragraphs 1 through 58 of the Verified Complaint as if fully set forth herein.

60. Under the terms of her Agent's Contract and Addendum, Jerome agreed for a period of one year following the termination of her contract not to "directly or indirectly, induce or attempt to induce or assist any Client of [NM or Plaintiffs]" as to whom they received compensation or provided services to "withdraw, curtail, reduce, cancel, surrender or terminate any insurance, annuities, securities products or any other existing business or commercial relationship with [NM or Plaintiffs] or any of [their] subsidiaries or affiliates."  *See* Ex. B, ¶ 1.

61. Jerome's Agent's Contract and Addendum, including the restriction on solicitation, constitute valid and enforceable contracts as demonstrated by her signature on the agreements. *See* Ex. A, p. 8 and Ex. B, p. 2.

62. The terms of this post-termination covenant are reasonable in their scope, and the provisions are necessary to protect Plaintiffs' legitimate business interests.

63. Jerome has breached her Agent's Contract and Addendum by soliciting – during the restricted period – Plaintiffs' clients and inducing them to "withdraw, curtail, reduce, cancel, surrender or terminate any insurance, annuities, securities products or any other existing business or commercial relationship with [NM or Plaintiffs]."

64. Jerome also has breached her Agent's Contract by improperly accessing, using, deleting and/or destroying the Confidential Information and Trade Secrets when she accessed multiple client files and deleted hundreds of those files from her NM-issued laptop just days before her engagement with Plaintiffs ended.

65. Jerome has violated her post-termination obligations to Plaintiffs with full knowledge of those obligations under her Agent's Contract and Addendum and at law.

66. Jerome's breach of her contractual obligations to Plaintiffs has damaged Plaintiffs in an amount to be determined at trial, including but not limited to damages resulting from the loss of premiums and clients.

## COUNT II
## Violation of the DTSA

67. Plaintiffs incorporate by reference Paragraphs 1 through 66 of the Verified Complaint as if fully set forth herein.

68. In the course of her engagement, Plaintiffs granted Jerome access to and use of Confidential Information and Trade Secrets, as defined above.

11

69. The Confidential Information and Trade Secrets to which Jerome had access is related to NM's life insurance products and services that are used in or intended for use in interstate or foreign commerce.

70. Plaintiffs spent significant time and money developing their Confidential Information and Trade Secrets.

71. Plaintiffs protect, maintain as confidential and do not generally disclose their Confidential Information and Trade Secrets.

72. Plaintiffs have, at all times, taken reasonable measures to protect their Confidential Information and Trade Secrets, including, but not limited to, restricting electronic and physical access to such information and requiring their agents to be subject to various policies and as appropriate to execute various agreements which also require confidentiality, prior to having access to such information and receiving the opportunity for certain benefits from Plaintiffs.

73. The Confidential Information and Trade Secrets derive independent economic value, actual or potential, from being not generally known to, and not being readily ascertained through proper means by, another person who can obtain economic value from the disclosure or use of that information.

74. Disclosure and unauthorized use of this type of information undermines Plaintiffs' competitive position in the industry.

75. Jerome misappropriated Plaintiffs' Confidential Information and Trade Secrets by deleting and, upon information and belief, retaining Plaintiffs' documents, including customer-related files and folders.

76. Upon information and belief, Jerome is still in possession of, or has used, disclosed, or relied upon the Confidential Information and Trade Secrets to benefit herself and to compete against Plaintiffs.

77. Upon information and belief, Jerome disclosed the Confidential Information and Trade Secrets to NYLI and has been using, and is continuing to use the Confidential Information and Trade Secrets to compete against Plaintiffs.

78. Jerome's conduct is knowing, willful, intentional, malicious, unprivileged, and in bad faith, and caused - and will continue to cause - immediate and irreparable harm to Plaintiffs, as well as causing it to suffer compensatory damages.

79. Plaintiffs are entitled to injunctive relief, compensatory damages, exemplary damages, an award of reasonable attorneys' fees and/or other appropriate relief under Section 1836 of the DTSA.

## COUNT III
## Unfair Competition

80. Plaintiffs incorporate by reference Paragraphs 1 through 79 of the Verified Complaint as if fully set forth herein.

81. Jerome, by engaging in the conduct described herein, has engaged in unfair competition with Plaintiffs.

82. Jerome's conduct has been and continues to be willful, intentional and unprivileged.

83. Jerome's conduct is contrary to honest industrial and commercial practices.

84. Jerome's intentional conduct has caused and will continue to cause damage to Plaintiffs, their business relationships with their customers and prospective customers, and their other valuable business interests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Award Plaintiffs actual and compensatory damages as shall be determined at trial for injuries and damages which Plaintiffs have sustained as a consequence of Jerome's wrongful conduct;

(b) Award Plaintiffs punitive damages for Jerome's willful, wanton and malicious conduct;

(g) Award costs, expenses and legal fees incurred by Plaintiffs in bringing this lawsuit to enforce their contractual and common law rights and rights under the DTSA; and

(h) Award such other relief as the Court deems to be just and proper.

Respectfully submitted,

Dated: July 9, 2021

*s/ Erin J. McLaughlin*
Erin J. McLaughlin *(PA 202044)*
erin.mclaughlin@bipc.com
Nicholas J. Bell *(PA 307782)*
nicholas.bell@bipc.com
Charles H. Cope *(PA 321779)*
chip.cope@bipc.com

BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
Phone:    412-562-8800
Facsimile:  412-562-1041

## VERIFICATION

I, Craig Fiedler, verify that I am the Managing Director for KEM Financial Services, LLC d/b/a Northwestern Mutual - Pittsburgh, and I am authorized to make this Verification on its behalf. I hereby verify, on my own behalf and on behalf of KEM Financial Services, LLC d/b/a Northwestern Mutual – Pittsburgh, that the averments of fact contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. I understand that this Verification is made subject to the penalties relating to unsworn falsification to authorities.

Dated: June 23, 2021